FILED
United States Court of Appeals
Tenth Circuit

August 20, 2013

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

      v.

BRIAN WILLIAM McKYE,

        Defendant - Appellant.

No. 12-6108

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA
(D.C. No. 5:11-CR-00045-R-1)**

---

Howard A. Pincus, Assistant Federal Public Defender (Raymond P. Moore,[*]
Federal Public Defender, with him on the brief), Denver, Colorado, for Defendant
- Appellant.

Susan Dickerson Cox, Assistant United States Attorney (Sanford C. Coats, United
States Attorney, and Suzanne Mitchell,[**] Assistant United States Attorney, with
her on the brief), Oklahoma City, Oklahoma, for Plaintiff - Appellee.

---

Before **BRISCOE,** Chief Judge, **BRORBY**, and **MURPHY**, Circuit Judges.

---

**MURPHY**, Circuit Judge.

---

[*]Warren R. Williamson, Federal Public Defender, Interim, replaced
Raymond P. Moore.

[**]Suzanne Mitchell withdrew as attorney for Plaintiff-Appellee on February
1, 2013.

## I.  Introduction

Defendant-Appellant, Brian William McKye, was charged with eight counts of securities fraud, in violation of 15 U.S.C. § 78j(b), and one count of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h).  At trial, McKye tendered an instruction that would have permitted the jury to decide whether the investment notes at issue were securities under the federal securities laws.  The district court refused to give McKye's instruction, instead instructing the jury that the "term 'security' includes a note."

The jury convicted McKye on the conspiracy charge and seven of the fraud charges.  The district court sentenced him to 262 months' incarceration, calculating his advisory guidelines range by applying a two-level upward adjustment to his base offense level for the use of sophisticated means.  In this appeal, McKye challenges both his convictions and his sentence, arguing the refusal to give the tendered instruction is reversible error and the calculation of his advisory guidelines range is clearly erroneous.

Exercising jurisdiction pursuant to 28 U.S.C. § 1291, this court **reverses** McKye's convictions.

## II.  Background

On February 3, 2011, McKye was named in a nine-count indictment returned in the United States District Court for the Western District of Oklahoma. The indictment alleged that McKye and Joe Don Johnson engaged in fraud in

connection with the purchase and sale of securities. The charged fraud involved eight separate transactions and implicated the following entities owned or operated by McKye: Global West Funding, LLC and Global West Financial, LLC (collectively "Global West"); Sure Lock Financial, LLC and Sure Lock Loans, LLC (collectively "Sure Lock"); The Wave-Goldmade, Ltd. ("TW Goldmade"); and Heritage Estate Services, LLC ("Heritage"). The conspiracy charge alleged McKye and Johnson conspired to launder money derived from the securities fraud. The matter proceeded to trial in November 2011.

As part of its business, Heritage prepared revocable trusts for clients. If a client could not afford to pay the full cost for the trust-preparation service, it could be financed. Clients who financed the service signed a promissory note in favor of Heritage, agreeing to pay the balance due over a thirty-six-month period (the "trust loan"). In some cases, there was documentation appended to the trust loan in the form of a purported lien on the client's home.[1] The trust loans were eventually sold to Global West.

At trial, the Government presented evidence that, as part of the overall scheme, Heritage also marketed to Heritage clients certain investment notes

---

[1]Although McKye's counsel referred to these liens as "mechanic or materialman's lien[s]," pursuant to Oklahoma law mechanics' liens can only "protect the right to payment of those supplying material, labor, services, or equipment in the construction, alteration, or repair of any improvement on land." *Jones v. Purcell Invs., LLC*, 231 P.3d 706, 710 (Okla. Civ. App. 2009).

issued by Global West. The notes were titled "Premium 60 Account" and each had a subheading identifying them as "notes" bearing a guaranteed annual return of between 6.5% and 19.275% for five years. Stephen Moriarty, the special master appointed to oversee the entities controlled by McKye, testified that he reviewed the investment notes issued by Global West and many of them consisted only of the contract itself. Many others, however, were accompanied by an additional document Moriarty described as "an attempt or representation to a particular investor that there was a pledge of collateral, a backup note, to secure repayment of their investment contract." The additional document was titled "Assignment of Note/Lien/Mortgage Collateral (Blanket Assignment)" and Moriarty testified it was essentially a list of trust loans taken out by individuals who had financed their trust-preparation services through Heritage. Julie Smith, a former Heritage employee testified the list of "blanket assignments" allegedly represented to the investor that there was a pledge of collateral to secure repayment of their investment. Smith confirmed that the document listed the names of individuals who had financed the cost of the services they received from Heritage.

Rick Hollis, a former Heritage salesman, testified McKye instructed Heritage salesmen to tell potential investors the Global West investment notes were backed by real estate notes and mortgages. During a training meeting, salesmen were also told by McKye that the investment notes were not securities.

Individual investors testified that Heritage salesmen told them their investments were backed by real estate and secured by liens that would be perfected by Global West.

A total of $5,885,515 received from the sales of the investment notes was transferred to Global West, Sure Lock, and TW-Goldmade—all entities owned or controlled by McKye. Robert Summers, an IRS Special Agent, testified that some of the money was used to make monthly interest payments to investors and some was paid to Heritage. According to Summers, the remainder of the investor funds was used to pay McKye's personal and business expenses. Summers further testified that during his investigation he examined bank records and determined McKye was operating a Ponzi scheme because the principal from newer investors was being used to make the interest payments to older investors.

McKye testified that after his business records were subpoenaed by the Oklahoma Department of Securities in 2007, he began including the blanket assignments with the investment notes in an attempt to collateralize the investments with the trust loans. He admitted, however, that the purported liens associated with the trust loans were not necessarily recorded and no trust loan was worth more than $4000.[2] He further admitted that he intentionally listed the same

---

[2]The eight charges of securities fraud involved amounts ranging from $40,000 to $400,000. Summers testified that fewer than forty of the liens were perfected.

trust loan on the blanket assignments of multiple investment contracts, likening it to "people who will put second and third mortgages on the same piece of property." McKye acknowledged that, consequently, some investment notes would not actually be secured by the purported collateral because "[i]t's the first person who responds is the first person who can take that lien and go file it." McKye also testified he believed he had insurance policies that offered protection to investors.

McKye proposed an instruction requiring the jury to determine whether the investment notes in question were securities for purposes of the charged crimes.[3] In response, the Government argued the matter was a question of law that was beyond the province of the jury. The district court refused to give the instruction proposed by McKye, rejecting his argument that a jury is required to make findings of fact before deciding whether or not a note is a security. The court accepted the Government's argument that (1) notes are presumed to be securities and (2) McKye failed to present any evidence that would overcome that presumption, stating: "I do believe the law is that a note [is] considered a security, unless there are certain features to it, none of which has been apparent or there's been any evidence about in this case, so I'm satisfied that these notes meet the federal definition of a 'security.'"

---

[3]The indictment, tracking 15 U.S.C. § 78j(b), alleged wrongful acts "in connection with the purchase and sale of securities."

The jury convicted McKye on the conspiracy count and seven of the eight securities fraud counts. He was sentenced to 240 months' incarceration on the fraud counts, to be served concurrently to each other, and twenty-two months' incarceration on the conspiracy count, to be served consecutively to the fraud counts. This appeal followed.

## III. Discussion

McKye argues his convictions cannot stand because the district court tendered an erroneous jury instruction regarding an element of the Government's case—specifically, whether the "Premium 60 Accounts" at issue are securities. The challenged instruction, No. 21, defined the term security to "include[] a note." McKye asserts the instruction is an erroneous statement of the law because Supreme Court precedent establishes that not all notes are securities. *See Reves v. Ernst & Young*, 494 U.S. 56, 63 (1990) (holding notes are only presumed to be securities); *see also Holloway v. Peat, Marwick, Mitchell & Co.*, 900 F.2d 1485, 1487 (10th Cir. 1990). Thus, according to McKye, Instruction No. 21 permitted the jury to convict him without the necessity of the Government proving the notes at issue in this case were securities. Because McKye objected to this instruction at trial, we review the issue de novo, "to determine whether, as a whole, the instructions correctly state the governing law and provide the jury with an ample understanding of the issues and applicable standards." *United States v. Dowlin*, 408 F.3d 647, 667 (10th Cir. 2005) (quotation omitted).

The provision of the Securities Act of 1933 (the "Act") that McKye was charged with violating, prohibits fraud in connection with the purchase or sale of securities.[4] 15 U.S.C. § 78j(b). Although 15 U.S.C. § 77b(a)(1) defines a security to include "any note," the Supreme Court held in *Reves* that "the phrase 'any note' should not be interpreted to mean literally 'any note,' but must be understood against the backdrop of what Congress was attempting to accomplish in enacting the Securities Acts." 494 U.S. at 63. After first emphasizing that "Congress was concerned with regulating the investment market, not with creating a general federal cause of action for fraud," the Court adopted a judicially created list of several types of notes that "are not properly viewed as securities" because they are not the type of instrument Congress intended to regulate under the Act. *Id*. at 65 (quotation omitted). The Court then identified a list of notes falling "without the 'security' category," to include (1) a note delivered in consumer financing, (2) a note secured by a mortgage on a home, (3) a short-term note secured by a lien on a small business or some of its assets, (4) a note evidencing a character loan to a bank customer, (5) a short-term note secured by an assignment of accounts receivable, (6) a note which simply formalizes an open-account debt incurred in the ordinary course of business and (7) notes evidencing loans by commercial banks for current operations. *Id*. The Court

---

[4]The charged conspiracy was tied to the illegal activity of securities fraud. Thus, all of McKye's convictions are implicated by the challenged instruction.

-8-

further explained that any note bearing a "family resemblance" to the enumerated notes also does not fall within the Act's definition of a security.  *Id.* at 65-67.  It adopted a four-part test to determine whether a note meets the family resemblance test.  *Id.* at 66-67.  The four factors are: (1) "the motivations that would prompt a reasonable seller and buyer to enter into it," (2) "the 'plan of distribution' of the instrument," (3) the "reasonable expectations of the investing public," and (4) "whether some factors such as the existence of another regulatory scheme significantly reduces the risk of the instrument, thereby rendering application of the Securities Acts unnecessary."  *Id.* (citations omitted).  The Court summarized the approach it adopted as follows:

> We conclude, then, that in determining whether an instrument denominated a "note" is a "security," courts are to apply the version of the "family resemblance" test that we have articulated here: A note is presumed to be a "security," and that presumption may be rebutted only by a showing that the note bears a strong resemblance (in terms of the four factors we have identified) to one of the enumerated categories of instrument.  If an instrument is not sufficiently similar to an item on the list, the decision whether another category should be added is to be made by examining the same factors.

*Id.* at 67.

In *United States v. Gaudin*, 515 U.S. 506, 511-13 (1995), the Supreme Court held that the question of materiality in a perjury prosecution must be submitted to the jury because materiality constitutes an element of the offense and involves a mixed question of law and fact.  Relying on *Gaudin*, McKye argues the

question of whether a note is a security is one for the jury because the *Reves* family resemblance test, like the test for materiality, is heavily laced with factual determinations. McKye concedes the jury was not instructed that the instruments at issue are notes. He argues, however, that because the jury was instructed that all notes are securities, it was deprived of the opportunity to make a finding essential to conviction.

Citing *McNabb v. SEC*, 298 F.3d 1126, 1130 (9th Cir. 2002), the Government argues the question of whether a note is a security is solely a question of law. *McNabb* involved a disciplinary proceeding before the Securities and Exchange Commission, not a criminal prosecution for securities fraud. The appellant in *McNabb* challenged the SEC's final order that certain promissory notes were securities under the Securities and Exchange Act of 1934. *Id*. at 1129-30. Reviewing the SEC's determination *de novo*, the Ninth Circuit stated: "Whether a note is a security . . . is a question of law." *Id*. at 130. In the course of its review, however, the court concluded the SEC's findings underlying the legal determination were "supported by substantial evidence." *Id*. at 1132. *McNabb*, therefore, actually supports McKye's argument that whether a note is a security is a mixed question of fact and law with the jury finding certain predicate facts and then applying those facts to the correct legal standard.

Reading *Reves* and *McNabb* in conjunction with *Gaudin* convinces us that the question of whether a note is a security has both factual and legal

components.  Application of the four factors set out in *Reves* to determine whether a note meets the family resemblance test requires findings related to motivation, distribution, expectation, and risk.  *See Reves*, 494 U.S. at 66-67; *see also McNabb*, 298 F.3d at 1131-32 (discussing some of the factual inquiries underlying the family resemblance test).  The legal standard set out in *Reves* must then be applied to these findings to arrive at the determination of whether a particular note is a security.  Although we agree with McKye that the question is a mixed question of fact and law, that is not the end of the inquiry.

*Gaudin* makes clear that mixed questions of fact and law must only be submitted to the jury if they implicate an element of the offense.  515 U.S. at 522-23.  ("The Constitution gives a criminal defendant the right to have a jury determine, beyond a reasonable doubt, his guilt of every element of the crime with which he is charged.").  The Government asserts *Gaudin* is inapplicable because the question of whether notes are securities is not an element, but instead involves the application of a presumption that McKye had the burden of rebutting.[5]  McKye asserts resolution of the issue in his favor is self-evident

---

[5]The Government provides no authority for this position.  The only logical extension of its single-sentence argument is that it believes the question of whether notes are securities cannot be an element of the offense because the Supreme Court in *Reves* held that the issue involves the application of a mandatory presumption.  *See Francis v. Franklin*, 471 U.S. 307, 314-15, 314 n.2 (1985) (holding a mandatory presumption, either conclusive or rebuttable, as to an element violates a defendant's due process rights because it conflicts with the

(continued...)

because the Government cannot "plausibly argue it did not have to prove the existence of a 'security' as to each count." *See Mullaney v. Wilbur*, 421 U.S. 684, 701 (1975) (describing the prosecution's burden of proving a negative as a "traditional burden which our system of criminal justice deems essential"). Neither party's appellate argument is particularly comprehensive or persuasive. But that is of no moment, because this court has already held that the question of whether the alleged fraud involved a security is an element of the crime of securities fraud. *United States v. Lewis*, 594 F.3d 1270, 1274 (10th Cir. 2010) ("Securities fraud requires (1) fraudulent conduct (2) in connection with the offer or sale of any security (3) by the use of any means or instructions of transportation or communication in interstate commerce."). Further, Instruction No. 16 so instructed the jury. *See United States v. Williams*, 376 F.3d 1048, 1051 (10th Cir. 2004) ("The law of the case is applied to hold the government to the burden of proving each element of a crime as set out in a jury instruction to which it failed to object, even if the unchallenged jury instruction goes beyond the criminal statute's requirements.").

---

[5](...continued)
prosecution's burden to prove beyond a reasonable doubt every fact necessary to constitute the crime charged). McKye does not address this argument. But, the *Reves* Court did not address, let alone conclusively hold that the presumption it adopted applies in the context of a criminal proceeding.

Because the question of whether a note is a security is a mixed question of fact and law and because this jury was instructed that the Government was required to prove the instruments issued by Global West were securities as an element of its case, the district court erred when it instructed the jury that notes are securities. *Cf. Gaudin*, 515 U.S. at 511-15; *see also United States v. Holly*, 488 F.3d 1298, 1307 n.7 (10th Cir. 2007) ("A conviction violates due process if the state is not required to prove every element of the offense beyond a reasonable doubt. In this case, the erroneous jury instruction relieved the government of its burden to show . . . a necessary element of the offense . . . . Thus, the erroneous jury instruction in this case is constitutional error." (citation omitted)). Even though the jury was erroneously instructed that all notes are securities, however, it was not instructed that the "Premium 60 Accounts" are notes. Thus, Instruction No. 21 did not have the effect of directing a verdict in favor of the Government and McKye concedes the error can be reviewed for harmlessness.[6] *See Rose v. Clark*, 478 U.S. 570, 580-81 (1986) (holding an

_____

[6]The district court gave the jury two ways to find the securities element. The jury was instructed that "the term 'security' includes a note or an 'investment contract.'" It was then further instructed that "[a]n investment contract is defined as the investment of money in a common enterprise with profits to come solely from the efforts of others." McKye does not challenge the portion of the instruction relating to investment contracts. Appellant Brief at 45 n.4. We have held, however, that when there is legal error as to one basis for finding an element, the submission of an alternative theory for making that finding cannot sustain the verdict "unless it is possible to determine the verdict rested on the

(continued...)

-13-

instruction that permits a jury to draw a particular conclusion if predicate findings are made, is not the equivalent of a directed verdict on the issue and can be reviewed for harmlessness). The Government's attempt to show the instructional error was harmless, however, falls short.

The Government asserts (1) it presented "ample facts" from which the jury could determine whether McKye's fraudulent conduct involved the purchase or sale of notes that are securities and (2) McKye "completely failed to counter the evidence that the investment contracts were securities." The chief problem with the first part of the Government's argument is that it not does provide a single record citation directing this court to these "ample facts." The Government's argument is, thus, wholly inadequate to meet the burden of showing the securities element was "'uncontested and supported by overwhelming evidence.'" *Holly*, 488 F.3d at 1307 (quoting *United States v. Neder*, 527 U.S. 1, 17 (1999)). While the alluded-to evidence may actually exist, it is not the responsibility of this court to comb the record to find it.

---

[6](...continued)
valid ground." *United States v. Holly*, 488 F.3d 1298, 1305 (10th Cir. 2007). The Government has not attempted to show that the jury's verdict rested on the investment contract theory rather than the note theory. Neither does it argue "the jury necessarily made the findings required to support a conviction on the valid ground." *Id*. at 1306 (quotation omitted). Because McKye's convictions cannot be sustained on either of those two bases, the Government must show harmlessness "as to the erroneously instructed ground considered separately." *Id*.

As to the second part of the Government's harmlessness argument, it is far from clear that McKye had any burden to rebut the evidence the Government presented during the trial. *See supra* n.5; *cf. United States v. Allen*, 449 F.3d 1121, 1125 (10th Cir. 2006) ("The fundamental concept of an affirmative defense is that it does not negate an element of the adversary's case."). McKye certainly has no burden on appeal to show that the district court's error was *not* harmless. *See United States v. Serawop*, 410 F.3d 656, 669 (10th Cir. 2005) (holding the burden of showing harmlessness rests with the Government). But, even assuming McKye was required to present some evidence at trial, he has pointed, *inter alia*, to his own testimony that he had insurance which ameliorated the risk to investors and evidence the Premium 60 Accounts were secured, in part, by the trust loans. He further asserts this testimony is relevant to the fourth part of the family resemblance test which addresses whether there is something that "significantly reduces the risk of the instrument, thereby rendering application of the Securities Act unnecessary." *Reves*, 494 U.S. at 67-68 (indicating insurance and collateralization could be such a risk-reducing factors). This evidence demonstrates that the issue of whether the investment notes were securities was contested at trial.

Having fully considered the arguments of the parties, we conclude the Government has failed to show the district court's instructional error was harmless.[7]

## IV.    Conclusion

The judgment of conviction is **reversed** and the matter **remanded** for further proceedings not inconsistent with this opinion. McKye's unopposed Motion to Redact and/or Seal Portions of the Supplemental Record is **granted**.

---

[7]Because we reverse McKye convictions on the basis of instructional error, it is unnecessary to address his challenge to his sentence.

No. 12-6108, United States v. McKye

**BRISCOE,** Chief Judge, concurring.

I am pleased to join the majority's well-reasoned opinion. I write separately only to voice my concern that our standard for harmless error review expressed in United States v. Holly, 488 F.3d 1298 (10th Cir. 2007) may be inconsistent with more recent Supreme Court precedent. As the majority makes clear, "[w]e have held . . . that when there is legal error as to one basis for finding an element, the submission of an alternative theory for making that finding cannot sustain the verdict unless it is possible to determine the verdict rested on the valid ground" or that "the jury necessarily made the findings required to support a conviction on the valid ground." Op. at 13 n.6. But this holding has been called into at least some doubt by Hedgpeth v. Pulido, 555 U.S. 57 (2008) (per curiam).

In Holly we addressed whether the jury was properly instructed on the definition of aggravated sexual abuse. The statute at issue, 18 U.S.C. § 2241(a), prohibited "knowingly caus[ing] another person to engage in a sexual act" by using force or fear. 488 F.3d at 1301. While the district court properly instructed the jury on the definition of force, it incorrectly instructed the jury on the definition of fear. Id. at 1302-04. This left this court to determine how to apply harmless error analysis when the jury was improperly instructed on one of two alternative grounds for proving an element of a crime.

We held that while we could affirm on the improperly instructed ground if there was overwhelming evidence to support that ground, we could not affirm on

the basis that there was overwhelming evidence to support a conviction on the properly instructed ground. "The possibility that the jury could have based its verdict in this case on the alternative force instruction, for which there was no error, [was] . . . irrelevant." Id. at 1307. Instead, we concluded that we could affirm on the alternative force instruction in only limited circumstances. Relying on United States v. Holland, 116 F.3d 1353, 1358 (10th Cir. 1997), we said that "an instructional error on one of two independent alternative grounds for conviction required the conviction be set aside unless we can be assured the jury did in fact rely on the valid ground, or unless the jury necessarily made the findings required to support a conviction on the valid ground." Id. at 1306 (alteration and quotation omitted).

While there is no question that we as a panel are typically bound by this court's prior precedent absent subsequent decision by an en banc court,[1] I note a number of problems with our continued reliance on Holland and Holly. Holly cited Stromberg v. California, 283 U.S. 359 (1931), for the proposition that an appellate court "may not affirm a conviction based solely on overwhelming evidence of the properly instructed ground." Holly, 488 F.3d at 1307 n.6. In

_____

[1] And the government has not asked us to reexamine Holly in light of Hedgpeth. See United States v. Edward J., 224 F.3d 1216, 1220 (10th Cir. 2000) ("Under the doctrine of stare decisis, the panel cannot overturn the decision of another panel of this court barring en banc reconsideration, a superseding contrary Supreme Court decision, or authorization of all currently active judges on the court." (quotation omitted)).

support, the Holly court noted in a parenthetical that the Supreme Court in

Stromberg "refuse[d] to sustain a conviction even though it may have been based

on a valid ground." Id. More recently, though, the Supreme Court has explained

that we should not draw this conclusion from older cases such as Stromberg

because these cases were decided before the Court held that "constitutional errors

can be harmless." Hedgpeth, 555 U.S. at 60. The Court in Stromberg had no

"reason to address whether the instructional errors they identified could be

reviewed for harmlessness, or instead required automatic reversal." Id.

Therefore, Stromberg does not provide guidance in determining the appropriate

remedy when a defendant is convicted under jury instructions that contained

alternative grounds for conviction, one of which was improper.[2]

---

[2] In addition, the Holly court does not appear to have taken into full account the extent to which Supreme Court precedent undermined our reasoning in Holland. In Holland, we endorsed Justice Scalia's view that an error in a jury instruction "cannot be rendered harmless by the fact that, given the evidence, no reasonable jury would have found otherwise." 116 F.3d at 1357. But the Supreme Court in United States v. Neder, 527 U.S. 1 (1999), affirmed a conviction even though the district court had omitted an element of the crime from its jury instructions. The Supreme Court held that "where a reviewing court concludes beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error, the erroneous instruction is properly found to be harmless." Id. at 17; see also, Neder, 527 U.S. at 30 (Scalia, J., dissenting) (dissenting "because I believe that depriving a criminal defendant of the right to have the jury determine his guilt of the crime charged—which necessarily means his commission of *every* element of the crime charged—can never be harmless").

Hedgpeth, however, does provide some insight into this question.  In Hedgpeth, the Court held that it is not structural error requiring reversal when the jury renders a general verdict after instruction on alternative theories of guilt: one valid and one invalid.  Instead, "a reviewing court finding such error should ask whether the flaw in the instructions had substantial and injurious effect or influence in determining the jury's verdict." Id. at 58.  While the Supreme Court did not explain how to apply that test in this context, some circuits have altered their precedent in light of it.

The Fifth Circuit, for instance, now  "ask[s] whether the record contains evidence that could rationally lead to an acquittal with respect to the valid theory of guilt."[3] United States v. Skilling, 638 F.3d 480, 482 (5th Cir. 2011) (alteration omitted).  Cf. United States v. Andrews, 681 F.3d 509, 521 (3d Cir. 2012) ("Where there is a clear alternative theory of guilt, supported by overwhelming evidence, a defendant likely cannot show that an instruction permitting the jury to convict on an improper basis was not harmless error.").[4]  In Skilling, the defendant was convicted of conspiracy.  However, the court did not know what

_____

[3]  The Fifth Circuit will also affirm on the alternate grounds if "the jury, in convicting on an invalid theory of guilt, necessarily found facts establishing guilt on a valid theory." Skilling, 638 F.3d at 482.

[4]  "In contrast, where evidence on the valid alternative theory is relatively weak, the government relies heavily on the improper theory, and the district court's instructions on the improper theory are 'interwoven' throughout the jury charge, the instructional error will not be harmless." Andrews, 681 F.3d at 522.

theory the jury relied on in reaching this verdict because the government "alleged several possible objects of the conspiracy, including securities fraud and honest-services fraud." Id. at 481. Because the Supreme Court had reduced the scope of the honest-services fraud statute, the Fifth Circuit had to decide whether it could affirm the conviction for conspiracy based on the theory of securities fraud for which the jury had received a proper instruction. The court held that it could. "Based on our thorough examination of the considerable record in this case, we find that the jury was presented with overwhelming evidence that [the defendant] conspired to commit securities fraud, and thus we conclude beyond a reasonable doubt that the verdict would have been the same absent the alternative-theory error." Id. at 483-84.

Other circuits, though, continue to hold the government to a higher burden. The Fourth and Seventh Circuits still use a Holly-like standard in assessing whether the government can prove that any error was harmless. The Fourth Circuit has said that "[i]f the evidence that the jury necessarily credited in order to convict the defendant under the instructions given is such that the jury must have convicted the defendant on the legally adequate ground in addition to or instead of the legally inadequate ground, the conviction may be affirmed." Bereano v. United States, 706 F.3d 568, 578 (4th Cir. 2012) (alteration and quotation omitted); see also Sorich v. United States, 709 F.3d 670, 674 (7th Cir. 2013) ("We have described the harmless-error inquiry in a claim of Skilling error

as a question of whether the trial evidence was such that the jury must have convicted the petitioners on both theories of fraud—money/property and honest services.").  And the Ninth Circuit has taken yet another approach.  It looks to whether it can discern with "reasonable probability" that the jury instead convicted the defendant on the alternate, but valid, ground.  Babb v. Lozowsky, No. 11-16784, ___ F.3d ___, 2013 WL 2436532 at *13 (9th Cir. June 6, 2013).

Fortunately, we have no need to resolve this question in this case as we are bound by our prior precedent and the government has not attempted to establish that the jury verdict rested on a properly instructed theory.  I therefore join the majority and write only to highlight this as an issue meriting further review by our court when properly preserved.