**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 16, 2015**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

BRIAN WILLIAM McKYE,

Defendant - Appellant.

No. 14-6057
(W.D. Okla.)
(D.C. No. 5:11-CR-00045-R-1)

**ORDER AND JUDGMENT**[*]

Before **GORSUCH**, **MURPHY**, and **MORITZ**, Circuit Judges.

I.      **Introduction**

Following a jury trial, Appellant Brian William McKye was convicted of

seven counts of securities fraud, in violation of 15 U.S.C. § 78j(b), and one count

of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h).

In this appeal, McKye challenges both his convictions and his sentence.

---

[*]This order and judgment is not binding precedent except under the
doctrines of law of the case, res judicata, and collateral estoppel.  It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

During McKye's trial, a witness testified that an Oklahoma state court had previously determined the investment notes at issue were securities. McKye argues this was inadmissible hearsay and the district court erred by permitting it to be admitted. At sentencing, the district court calculated McKye's advisory guidelines range by applying the sophisticated means enhancement set out in USSG § 2B1.1(b)(10)(C). McKye argues it was clear error to apply this enhancement.

Exercising jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a), this court **affirms** McKye's convictions and sentence.

## II.    Background

In 2011, a jury found McKye guilty of securities fraud and conspiracy. His convictions, however, were overturned by this court. *United States v. McKye*, 734 F.3d 1104, 1111 (10th Cir. 2013). McKye was retried in 2014 and convicted a second time. Once again, a central question at trial was whether the investment notes McKye marketed and sold were securities. *Id*. at 1107 & n.4. To prove this element, the Government put on evidence showing the investment notes were both investment contracts and notes that qualify as securities. *See* 15 U.S.C. § 77b(a)(1) (defining the term "security" to include notes and investment contracts).

McKye, who represented himself at trial, called Patricia LaBarthe as his first witness. LaBarthe's testimony focused on an investigation into McKye's

activities conducted by the Oklahoma Department of Securities in 2006. The investigation was initiated when the Department of Securities received an anonymous complaint about Global West Funding, an entity controlled by McKye.[1] LaBarthe was the agency lawyer assigned to the investigation. During cross-examination, the Government questioned LaBarthe about the outcome of a state civil action filed against McKye and his companies as a result of her agency's investigation. The investment notes at issue in that civil action were the same as the ones at issue in McKye's federal criminal trial. LaBarthe testified that the state court determined the investment notes were securities. This testimony forms the basis for McKye's challenge to his convictions.

McKye was found guilty and the matter proceeded to sentencing. Adopting the recommendation made in the Presentence Investigation Report, the district court calculated McKye's advisory guidelines range by applying the sophisticated means enhancement set out in USSG § 2B1.1(b)(10)(C). This enhancement increased McKye's base offense level by two levels. Application of this enhancement forms the basis for McKye's challenge to his sentence.

---

[1]"The charged fraud . . . implicated the following entities owned or operated by McKye: Global West Funding, LLC and Global West Financial, LLC (collectively "Global West"); Sure Lock Financial, LLC and Sure Lock Loans, LLC (collectively "Sure Lock"); The Wave-Goldmade, Ltd. ("TW Goldmade"); and Heritage Estate Services, LLC ("Heritage")." *United States v. McKye*, 734 F.3d 1104, 1105 (10th Cir. 2013).

## III.  Discussion

### A.  *Hearsay Testimony*

McKye argues the district court erred by admitting LaBarthe's testimony regarding the Oklahoma state court's determination that the investment notes marketed by McKye were securities.  The Government does not contest McKye's assertion that the judicial finding was inadmissible hearsay because it was an "out-of-court . . . statement by a judge . . . offered to prove the truth of the matter asserted."  *Herrick v. Garvey*, 298 F.3d 1184, 1191 (10th Cir. 2002).  The parties do, however, argue over whether the issue was adequately preserved.  The Government takes the position McKye failed to clearly object to LaBarthe's testimony during trial and, thus, the issue should be reviewed by applying the plain-error standard.  *See United States v. Hinson*, 585 F.3d 1328, 1338 (10th Cir. 2009) (reviewing for plain error when the defendant failed to object to the admission of hearsay testimony).  McKye argues the objection he lodged immediately after LaBarthe's testimony was sufficient to preserve the hearsay issue and his convictions should be reversed unless the Government can prove any error in admitting the testimony was harmless.  *See United States v. Collins*, 575 F.3d 1069, 1073 (10th Cir. 2009) (applying the harmless-error standard to a trial court's ruling on a hearsay objection).  It is unnecessary to resolve the dispute over the appropriate standard of review because, even if McKye's

-4-

objection was adequate to preserve the issue, the admission of LaBarthe's testimony was harmless.

"A harmless error is one that does not have a substantial influence on the outcome of the trial; nor does it leave one in grave doubt as to whether it had such effect." *United States v. Jones*, 44 F.3d 860, 873 (10th Cir. 1995). The erroneous admission of hearsay evidence is harmless when the Government presents strong evidence of a defendant's guilt. *United States v. Shaw,* 758 F.3d 1187, 1197 (10th Cir. 2014). Because there was strong evidence that the investment notes were securities under both the investment contract and the note tests, we have no doubt LaBarthe's testimony did not influence the outcome of McKye's trial.

Under the investment contract theory, an instrument is a security if: (1) an individual invests money, (2) in a common enterprise, (3) with an expectation of profits derived solely through the efforts of others. *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298-99 (1946). Nearly a dozen witnesses testified about their transactions with McKye. One testified he was told the money he gave McKye would be used to buy properties and he would receive a 9.5% return without doing anything other than transferring the funds. Another testified she invested more than $40,000 with McKye's company, Global West Financial, with the expectation she would receive a 9.75% rate of return generated by investments in real estate. The testimony of ten additional witnesses was substantively identical.

Although victims were also told their money was collateralized by liens or mortgages on real property, there was evidence that only eleven of 528 lien assignments were filed with a county clerk.

Further, the investment note contracts referred to the victims as "investors"; multiple victims testified they understood they were investing money in McKye's businesses, not making a loan to him; and there was no evidence any victim was in the business of making loans. *See Zabriskie v. Lewis*, 507 F.2d 546, 551-52 (10th Cir. 1974) (holding promissory notes received in "isolated transactions outside normal commercial circles" by individuals seeking to make investments are securities, not commercial loans). The victims' testimony was consistent with the testimony of McKye's co-conspirator who stated that McKye explained his scheme in terms of investments and instructed sales representatives to market the instruments as investments. McKye told the sales representatives he was able to offer an extremely high interest rate to investors because of a purported agreement he had negotiated with Bank of America.

In sum, the Government's evidence showed McKye pooled the money he received from the victims and used it to operate his businesses, including making loans to third parties.[2] Because the investments were not fully collateralized, if

---

[2]The evidence showed between sixty and eighty individuals transferred funds to one of several entities controlled by McKye. A portion of these funds was funneled to a "pay day loan" business operated by McKye, and loaned out to individuals at 100% to 200% interest.

the third-party loans were not repaid, investors in McKye's scheme would not receive the return they had been promised and they would lose their initial investment.[3] In this way, the security of the victims' money was inexorably intertwined with the success of McKye's business ventures. The Government's evidence strongly supports the conclusion the instruments were investment contracts because victims of McKye's scheme invested money in a common enterprise with the expectation of receiving payments based on McKye's efforts, not their own.

There was equally strong evidence the investment notes were notes that qualified as securities. At trial, McKye admitted the instruments were notes, but took the position they were a type that does not qualify as a security. *But see Reves v. Ernst & Young*, 494 U.S. 56, 65 (1990) (holding "every note" is presumed to be a security). The following notes, and those that bear a "strong resemblance" to them are not securities:

> [a] note delivered in consumer financing, [a] note secured by a mortgage on a home, [a] short-term note secured by a lien on a small business or some of its assets, [a] note evidencing a "character" loan to a bank customer, short-term notes secured by an assignment of accounts receivable, or a note which simply formalizes an open-account debt incurred in the ordinary course of business (particularly if, as in the case of the customer of a broker, it is

---

[3]It is immaterial that victims were *told* their investments were risk free and collateralized by real property. *Woodward v. Terracor*, 574 F.2d 1023, 1024 (10th Cir. 1978) ("In determining whether a particular transaction is, or is not, an investment contract, . . . emphasis is placed on economic reality.").

collateralized), and notes evidencing loans by commercial banks for current operations.

*SEC v. Thompson*, 732 F.3d 1151, 1159 (10th Cir. 2013) (quotation omitted). Four factors are relevant to determining whether a note resembles one of the excluded notes: (1) "the motivations that would prompt a reasonable seller and buyer to enter into [the transaction]," (2) "the plan of distribution of the instrument," (3) "the reasonable expectations of the investing public," and (4) "whether some factor such as the existence of another regulatory scheme significantly reduces the risk of the instrument." *Reves*, 494 U.S. at 66-67 (quotation omitted).

As to the first factor, the Government presented considerable evidence, in the form of direct testimony, that the victims of McKye's scheme were motivated to invest by the expectation of a substantial return on their investment. The second and third factors also weigh heavily in favor of the jury's determination that the notes were securities. The Government's evidence showed that McKye marketed the investment notes to the general public using television and newspaper advertising, mailings, and telemarketing calls. There is no indication in the record that any restrictions were placed on who could invest. Further, multiple victims testified they thought of themselves as investors, not as lenders. Their testimony was consistent with both the Government's evidence showing

McKye marketed the notes as investments and the documents themselves which made numerous references to the term "investor."

The fourth factor also strongly supports the Government's burden of showing the notes were securities. The Government elicited testimony from a special agent with the Criminal Investigation Division of the Internal Revenue Service that his review of the financial records disclosed the "investor funds were not protected at all." Even assuming McKye is correct that the evidence upon which this witness relied actually showed that 29% of the investment notes were collateralized,[4] that would mean that 71% of the invested funds were at full risk of loss. Thus, the Government's evidence, even interpreted as McKye advocates, amply showed the actions allegedly taken by McKye to collateralize the investment notes did not meaningfully reduce the risk of loss to investors.

Having considered all the evidence presented at trial, we conclude the Government presented strong evidence that the investment notes were securities under both the investment contract theory and the note theory. There is no reasonable probability LaBarthe's testimony had any influence on the jury's

---

[4]There are serious analytical flaws in McKye's calculation that 29% of the investment notes were secured in some way from risk of loss. Most glaringly, his analysis is applicable only to the notes entered into after September 2007. It is from that point forward that McKye purported to collateralize the notes with lien assignments. McKye's own argument is necessarily a concession that one hundred percent of the investment notes sold before 2007 (approximately $3,230,000 in invested funds) were not even purportedly collateralized and, thus, 100% at risk.

finding on that element of the Government's case. *See Kotteakos v. United States*, 328 U.S. 750, 764-65 (1946) (holding a nonconstitutional error is harmless if, "after pondering all that happened without stripping the erroneous action from whole," the reviewing court is "sure that the error did not influence the jury, or had but very slight effect"). Accordingly, any error in admitting the testimony was harmless.

### B. Sentence Enhancement

McKye also challenges the sentence imposed by the district court, arguing the court erred by assessing a two-level increase to his offense level for use of sophisticated means. McKye concedes that his failure to challenge the application of the enhancement at sentencing means his claim is reviewed only for plain error. *See United States v. Frost*, 684 F.3d 963, 971 (10th Cir. 2012). To meet his burden under the plain error standard, McKye must show the district court erred, the error was plain, the error affected his substantial rights, and the error seriously affects the fairness, integrity, or public reputation of judicial proceedings. *United States v. Craig*, 794 F.3d 1234, 1238 (10th Cir. 2015).

McKye argues the district court committed error that was plain because the facts found by the court[5] do not show his offense conduct was "especially

---

[5]For purposes of the challenge to his sentence, McKye does not dispute any of the district court's factual findings. *See United States v. Svacina*, 137 F.3d 1179, 1187 (10th Cir. 1998) ("This court has held repeatedly that factual disputes not brought to the attention of the court do not rise to the level of plain error.").

complex or especially intricate," as required for the enhancement to apply. USSG § 2B1.1 cmt. n.9(B). We disagree.

McKye ran his scheme undetected from 2004 to 2009, using multiple entities to coordinate the fraud. He used telemarketers employed by Heritage Estate Services, a limited liability company in which he was not a member, to market the investment notes. He attempted to conceal commission payments to Heritage Estate Services. The investment notes were issued by Global West Financial or Sure Lock Financial. Interest payments, however, were made by The Wave-Goldmade, another entity controlled by McKye, making it appear the funds had actually been invested. McKye used mass marketing techniques, including newspaper and television ads, to attract more investors. Further, he induced individuals to invest in his scheme by deceiving them into believing their investments were collateralized by real property.

Because the evidence shows McKye used sophisticated means to perpetrate and conceal his fraud, the district court did not err, let alone plainly err, in applying the two-level sentencing enhancement. *See id*. (defining "sophisticated means" as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense").

## IV. Conclusion

The judgment of conviction and sentence is **affirmed**.

ENTERED FOR THE COURT


Michael R. Murphy
Circuit Judge